**NATIONAL BANK OF GEORGIA and NBG Pensacola Corporation, Plaintiffs,**

v.

**FIRST NATIONAL BANK HOLDING CORPORATION, Defendant.**

**Civ. A. No. 1:86–CV–2726–JTC.**

United States District Court, N.D. Georgia, Atlanta Division.

July 14, 1989.

John A. Chandler, Sutherland, Asbill & Brennan, Atlanta, Ga., for plaintiffs.

Steven M. Collins, Jennifer Ann Brown, Alston & Bird, Atlanta, Ga., David L. Fleming, Liberis Sauls & Fleming, Pensacola, Fla., for defendant.

## ORDER

CAMP, District Judge.

This action comes before the Court on plaintiffs' Motion for Summary Judgment and defendant's Motion for Partial Summary Judgment. For the reasons detailed below, plaintiffs' Motion for Summary Judgment is DENIED and defendant's Motion for Partial Summary Judgment is GRANTED IN PART.

### I. *Facts*

In 1983, plaintiff National Bank of Georgia ("NBG") made a loan in the principal

amount of $3,264,250.00 to defendant First National Bank Holding Company ("the Holding Company"), which owned a small bank in Pensacola, Florida, the First National Bank of Escambia County ("the Bank"). The Holding Company was the sole shareholder of the Bank and as collateral for the loan, the Holding Company granted NBG a security interest in all of the outstanding common stock of the Bank. *See* Pledge Agreement, Appendix to Brief in Support of Plaintiffs' Motion for Summary Judgment[1], Exhibit 5. On July 2, 1986, NBG notified the Holding Company that, pursuant to the Loan Agreement, it was in default. App. Ex. 13. NBG then accelerated the loan and demanded immediate payment of the principal amount, $3,050,-000.00, and all accrued and unpaid interest owed under the Note. NBG also informed the Holding Company that it was exercising its default rights under the Pledge Agreement, including its right to sell the pledged shares at a public sale.

Upon learning of NBG's intent to foreclose, Dr. William Permenter, a shareholder and former director of the Holding Company, began attempting to acquire stock or proxies to enable him to take control of the Holding Company. Permenter presented "Contract[s] for Sale of Stock and Proxy" to numerous Holding Company shareholders and obtained their signatures, thereby acquiring their proxies and their commitment to finalize the sale of their stock upon the receipt of regulatory approval. App. Ex. 17. Using the proxies, Permenter then executed a "Consent in Writing in Lieu of Special Meeting of Shareholders of First National Bank Holding Corporation." August 13 Consent.App.Ex. 18. The August 13 Consent purported to remove the members of the Board of Directors of the Holding Company, appoint Permenter and two others to the Board, and appoint Permenter as president of the Holding Company.

Also on August 13, 1986, the August 13 Consent was presented to the Board. The Board argued that the takeover attempt was ineffective due to Permenter's failure to comply with the notice provisions of the Change in Bank Control Act, 12 U.S.C. § 1817(j).[2] On August 15, 1986, representatives of the Federal Reserve Board met in Atlanta, Georgia with Permenter and his attorney, Michael J. Coniglio. The Federal Reserve advised Permenter that his acquisition of the proxies through the stock purchase agreement would be violative of the notice provisions of the Change in Bank Control Act ("CBCA"). Coniglio dep. p. 70.

On August 18, 1986, NBG and its subsidiary, plaintiff NBG Pensacola Corporation ("NBG Pensacola"), proposed to the Holding Company that NBG Pensacola would retain the pledged shares in full satisfaction of the loan and that the Holding Company would be given a one-year option to repurchase the shares at a discount if the option was exercised within six months. Option Agreement, App. Ex. 20. On August 19, 1986, the incumbent Board of Directors convened a special meeting and adopted a resolution accepting NBG's proposal. Subsequently, the Option Agreement was signed by the president and secretary of the Holding Company on the Holding Company's behalf. App. Ex. 22.

On August 22, 1986, Permenter mailed a copy of a second consent to several Holding Company shareholders. This second consent, dated August 18, 1986, was identical in substance to the August 13 Consent. App. Ex. 25.

Plaintiffs filed this action seeking a declaratory judgment and the parties have now filed cross motions for summary judg-

---

1. Throughout this Order, the Court will use "App.Ex.——" when citing to the Appendix to Brief in Support of Plaintiffs' Motion for Summary Judgment.

2. The Change in Bank Control Act states in pertinent part:
   No person, acting directly or indirectly or through or in concert with one or more other persons, shall acquire control of any insured bank through a purchase, assignment, transfer, pledge, or other disposition of voting stock of such insured bank unless the appropriate Federal banking agency has been given sixty days' prior written notice of such proposed acquisition and within that time period the agency has not issued a notice disapproving the proposed acquisition ...
   12 U.S.C. § 1817(j)(1).

ment. Plaintiffs contend that the Holding Company, having violated the notice provisions in the Change in Bank Control Act, did not replace its Board of Directors prior to the August 19th retention of shares and therefore, that NBG Pensacola acted properly in retaining the collateral in satisfaction of the loan. Conversely, defendant argues that plaintiffs have no standing to assert any alleged violations of the CBCA, that the Option Agreement between the incumbent Board and plaintiffs is therefore unenforceable, and that the ownership of the bank stock remains with the Holding Company.

## II. *Summary Judgment Standard*

Rule 56(c), Fed.R.Civ.P., defines the standard for summary judgment: Courts should grant summary judgment when "there is no genuine issue as to any material fact ... and the moving party is entitled to judgment as a matter of law." In *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986), the Supreme Court interpreted Rule 56(c) to require the moving party to demonstrate that the nonmoving party lacks evidence to support an essential element of his claim. Thus, the movant's burden is easily "discharged by showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." Once the movant has met this burden, the opposing party must then present evidence establishing a material issue of fact. *Id.* The nonmoving party must go beyond the pleadings and submit evidence in the form of affidavits, depositions, admissions and the like, to demonstrate that a genuine issue of material fact does exist. *Id.* The Supreme Court stated in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986), "that the plaintiff, to survive the defendant's motion, need only present evidence from which a jury might return a verdict in his favor. If he does so, there is a genuine issue of fact that requires a trial."

While all evidence and factual inferences are to be viewed in a light most favorable to the nonmoving party, *Rollins v. Tech-* *South, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987); *Everett v. Napper*, 833 F.2d 1507, 1510 (11th Cir.1987), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Id.* at 250, 106 S.Ct. at 2511. Similarly, a fact is not material unless it is identified by the controlling substantive law as an essential element of the nonmoving party's case. *Id.* at 248, 106 S.Ct. at 2510. Thus, the party opposing the summary judgment must come forward with specific evidence of every element essential to his case so as to create a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552; *Rollins*, 833 F.2d at 1528.

## III. *Conclusions of Law*

### A. No Private Right of Action Under the Change in Bank Control Act

The Holding Company maintains that the August 13 Consent removed the incumbent Board of Directors and thus terminated its authority to act on the Holding Company's behalf. If as defendant claims, the August 13 Consent was effective, then the incumbent Board acted without authority when it executed the Option Agreement on August 19, 1986.

Conversely, NBG argues that the August 13 Consent was defective in that it violated the notification provisions of the CBCA. Therefore, NBG contends that the incumbent Board was never removed and indeed possessed the requisite authority to execute the August 19th Option Agreement.

#### 1. The CBCA

The Change in Bank Control Act provides that "[n]o person, acting directly or indirectly or through or in concert with one or more other persons, shall acquire control of any insured bank through a purchase, assignment, transfer, pledge, or other dis-

position of voting stock of such insured bank" unless the Federal Reserve Board has been notified in writing, sixty days before the transaction. 12 U.S.C. § 1817(j)(1). The Act defines "control" as "the power, directly or indirectly, to direct the management or policies of an insured bank or to vote 25 per centum or more of any class of voting securities of an insured bank." 12 U.S.C. § 1817(j)(8)(B). NBG argues, and this Court agrees, that Permenter attempted to acquire "control" of the Holding Company through the stock purchase agreements executed on August 12, 1986, thus triggering the sixty day notice provision of the CBCA. App.Ex. 17; *See supra* p. 2. It is undisputed that Permenter did not provide the Federal Reserve Board with sixty days prior notice.

Using the proxies obtained through the stock purchase agreement, Permenter then executed a "Consent in Writing in Lieu of Special Meeting of Shareholders of First National Bank Holding Corporation." August 13 Consent. App.Ex. 18. The August 13 Consent purported to remove the members of the Board of Directors of the Holding Company, appoint Permenter and two others to the Board, and appoint Permenter as president of the Holding Company. NBG contends that the Consent was ineffective because it was obtained in violation of the CBCA.

### 2. No Private Right of Action

In essence, NBG is asking this Court to declare the August 13 Consent null and void because defendant violated the CBCA in obtaining the proxies. The Court finds as a matter of law, however, that NBG has no standing to enforce the CBCA as the Act neither expressly nor impliedly confers a right of action on private litigants.

The question of whether a private right of action exists under the CBCA has never been raised in this district nor has it been addressed by the Eleventh Circuit. Other district and appellate courts have confronted the issue and the results have varied. All agree, however, that to determine whether a given statute provides a private remedy, the Court must examine it in light of the four factors articulated by the Supreme Court in *Cort et al. v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975):

First, is the plaintiff 'one of the class for whose *especial* benefit the statute was enacted,' [citation omitted] that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? [citation omitted] Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? [citations omitted] And Finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

The crux of the issue, therefore, is whether Congress intended to create a private cause of action. *Touche Ross & Co. v. Redington*, 442 U.S. 560, 575, 99 S.Ct. 2479, 2488–89, 61 L.Ed.2d 82 (1979).

As noted previously, there is a split of authority on the issue. Two earlier cases held that Congress did indeed create a private right of action under the CBCA while more recent cases have reached the opposite conclusion. The Court will discuss both lines of authority.

In *First Alabama Bancshares, Inc. v. Lowder*, Fed.Sec.L.Rep. (CCH) ¶ 98,015 at 91,257–58 (N.D.Ala.1981) and *Mid–Continent Bancshares, Inc. v. O'Brien*, Fed.Sec. L.Rep. (CCH) ¶ 98,734 at 93,707, 93,709 (E.D. Mo.1981), the district courts found that the CBCA did create a private right of action. As *O'Brien* relied primarily on the earlier *Lowder* decision, this Court need only discuss the rationale of the *Lowder* court. In *Lowder*, plaintiffs were Southland Bancorporation ("Southland") and First Alabama Bancshares, Inc. *Lowder*, Fed.Sec.L.Rep. (CCH) at 91,249. Southland owned all the outstanding shares of Merchants National Bank of Mobile ("Merchants"). *Id.* Plaintiffs alleged that defendants were acting to thwart the sale of Merchants by taking control of Southland through a tender offer for its shares. *Id.*

Plaintiffs sought to enjoin defendants from purchasing additional shares of Southland because they had failed to give the Federal Reserve Board the requisite sixty days notice prior to taking control of Southland within the meaning of the CBCA. *Id.* at 91,256.

Analyzing the CBCA in light of the factors enumerated in *Cort et al. v. Ash,* 422 U.S. at 78, 95 S.Ct. at 2087, the *Lowder* court found that a private right of action does exist under the CBCA. First, the court determined that target holding companies such as Southland were Congress' intended beneficiaries of the CBCA. *Id.* at 91,257. Next, the court concluded that Congress intended to create such a private right of action because the civil penalties provided by the CBCA are of "little consolation to the target company whose stock is continually acquired in violation of the CBCA." *Id.* at 91,258. As to the third *Cort* factor, the court found that the purpose of the Act would be thwarted if defendants could circumvent the notice requirements. *Id.* And finally, the court noted that banking regulation had not traditionally been relegated to state law. *Id.*

A district court in Ohio came to the opposite conclusion in *Quaker City National Bank v. Hartley et al.,* 533 F.Supp. 126 (S.D.Ohio 1981). In *Quaker City,* the court analogized the CBCA to the Bank Holding Company Act ("BHCA") because both bestow on the Federal Reserve Board the power to review proposed acquisitions. *Id.* at 128. Noting that the BHCA preceded the CBCA, the court observed that Congress had framed the CBCA in much the same terms as the earlier statute. *Id.* In *Whitney National Bank v. Bank of New Orleans & Trust Co.,* 379 U.S. 411, 85 S.Ct. 551, 13 L.Ed.2d 386 (1965), the Supreme Court found that no private right of action existed under the BHCA and the *Quaker City* court believed the same reasoning would apply to deny such a cause of action under the CBCA. *Quaker City,* 533 F.Supp. at 128.

The court in *Quaker City* nevertheless went on to apply the *Cort* factors. Unlike the *Lowder* court, it concluded that the CBCA was not created for the "especial" benefit of the target bank, for "[n]othing in the legislative history even hints that Congress meant to benefit the banks themselves, much less to give their managers another weapon with which to defend against takeover attempts." *Id.* at 129. Furthermore, the *Quaker City* court found that Congress intended the CBCA to strengthen the role of the Federal Reserve Board, not strip away its power by granting concurrent jurisdiction to the district courts. *Id.* The court believed that the civil enforcement powers granted to the Federal Reserve Board by the CBCA, are substantial. Finally, the court expressly declined to follow the *Lowder* court's ruling, as sanctioning a private right of action under the CBCA "would run counter to the enforcement scheme envisioned by the drafters" of the Act. *Id.*

In 1986, a district court in Illinois agreed with the *Quaker City* court's conclusion that the CBCA does not confer a private right of action. In *Gianakas v. Siensa,* 649 F.Supp. 1033 (N.D.Ill.1986), plaintiff attempted to use the CBCA to enjoin defendants from obtaining a controlling interest in a bank. *Id.* at 1034. Defendants argued that plaintiffs lacked the standing to assert violations of the CBCA and the court agreed. *Id.* The court applied the *Cort* factors to the CBCA and expressly disagreed with the *Lowder* court's analysis. Under the first *Cort* factor, the *Gianakas* court pointed out that *Lowder's* conclusion that bank holding companies, i.e. shareholders, are the CBCA's intended beneficiaries, directly contradicts authority in the Seventh and Ninth Circuits.

[T]he Seventh Circuit ... observed that the CBCA disclosure and approval provisions appear 'to be aimed at the protection of the depositors of the bank, not of its shareholders, as well as the protection of the general public against monopolization of the banking industry.' [*Indiana National Corp. v. Rich,* 712 F.2d 1180, 1186 (7th Cir.1983)].

Similarly, the Ninth Circuit, directly addressing the issue of the existence of a private right of action, held that the first three criteria of the *Cort v. Ash* test

**1506**

were not satisfied. The Ninth Circuit held that: 'sections [§ 1817 and § 1818(a)] were not intended for the special benefit of the shareholders, there is no indication that Congress intended to create a remedy for the special benefit of the shareholders, and that a private remedy for the shareholders would be inconsistent with the legislative scheme.' *Harmsen v. Smith,* 542 F.2d 496, 503 (9th Cir.1976). *Id.* at 1036.

The *Gianakas* court also approved of the *Quaker City,* 533 F.Supp. 126, analogy of the CBCA to the BHCA: "If Congress was displeased with the Supreme Court's interpretation that the related BHCA provisions do not allow for private actions, Congress would not have framed the CBCA in much the same terms as the BHCA." *Gianakas,* 649 F.Supp. at 1036–37. Finally, the court in *Gianakas* concluded that the *O'Brien,* Fed.Sec.L.Rep. ¶ 98,734, and *Lowder,* Fed. Sec.L.Rep. ¶ 98,015, courts wrongly assessed the effectiveness of the civil remedies available to the Federal Deposit Insurance Corporation ("FDIC") under the CBCA. The court found that the ability of the FDIC to seek injunctions to compel compliance with the CBCA constituted adequate enforcement. *Gianakas,* 649 F.Supp. at 1037. Thus, the court in *Gianakas* held that the CBCA contained no private right of action. *Id.*

This Court finds the logic of the *Quaker City,* 533 F.Supp. 126, and *Gianakas,* 649 F.Supp. 1033, opinions to be more persuasive than the *Lowder,* Fed.Sec.L.Rep. ¶ 98,015, decision. Consequently, for the reasons articulated in *Gianakas,* this Court finds as a matter of law, that no private right of action exists under the CBCA.

In the case at bar, NBG as a secured creditor of the Bank, is attempting to assert the violation of the CBCA on behalf of the incumbent Board of Directors. If the August 13 Consent were defective, then the incumbent Board was never replaced and had the authority to enter into the Option Agreement with NBG. Therefore, NBG's interests are aligned with those of the target bank. The CBCA was not enacted to bestow any benefit on the target bank and certainly not to protect financial institutions in NBG's position. *See Quaker City,* 533 F.Supp. at 128. This Court will not allow NBG to use The Holding Company's violation of the CBCA's notification requirements to void the August 13 Consent.

Defendant's Motion for Partial Summary Judgment is GRANTED IN PART. The Court finds as a matter of law, that NBG lacks standing to assert any alleged violations of the CBCA. Whether the August 13 Consent was otherwise effective remains a material factual dispute. Consequently, plaintiffs' Motion for Summary Judgment is DENIED and defendant's Motion for Partial Summary Judgment on all grounds other than the question of a private right of action is DENIED.

SO ORDERED.